1   JOSEPH W. COTCHETT
      (Cal. SBN 36324; jcotchett@cpmlegal.com)
2   BARBARA L. LYONS
      (Cal. SBN 173548; blyons@cpmlegal.com)
3   **COTCHETT, PITRE & McCARTHY**
    840 Malcolm Road, Suite 200
4   Burlingame, CA 94010
    Telephone: (650) 697-6000
5   Facsimile: (650) 697-0577

6   DANIEL G. COOPER
      (Cal. SBN 153576; cleanwater@sfo.com)
7   **LAWYERS FOR CLEAN WATER, INC.**
    1004-A O'Reilly Avenue
8   San Francisco, CA 94129
    Telephone: (415) 440-6520
9   Facsimile: (415) 440-4155

10  ROBERT F. KENNEDY, JR.
      (*Pro Hac Vice* Pending; mpostman@law.pace.edu)
11  KEVIN J. MADONNA
      (*Pro Hac Vice* Pending; kmadonna@kennedymadonna.com)
12  **KENNEDY & MADONNA, LLP**
    48 Dewitt Mills Road
13  Hurley, NY 12443
    Telephone: (845) 331-7514
14  Facsimile: (845) 331-7578

15  Attorneys for Plaintiffs

ORIGINAL
FILED

MAY - 2 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-Filing

16          **UNITED STATES DISTRICT COURT**

17          **NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 18  **HOWARD McCONNELL;** | Case No. C 07 2382 |
| **LEAF G. HILLMAN;** | |
| 19  **ROBERT ATTEBERY;** | **COMPLAINT FOR:** |
| **FRANKIE JOE MYERS;** | |
| 20  **TERANCE J. SUPAHAN;** | **1. PRIVATE NUISANCE - CONTINUING** |
| **MICHAEL T. HUDSON;** | |
| 21  **BLYTHE REIS**; and | **2. PRIVATE NUISANCE - PERMANENT** |
| **KLAMATH RIVERKEEPER**, a project of | |
| 22  **KLAMATH FOREST ALLIANCE,** | **3. PUBLIC NUISANCE - CONTINUING** |
| a California nonprofit corporation; | |
| 23 | **4. PUBLIC NUISANCE - PERMANENT** |
|             Plaintiffs, | |
| 24 | **5. TRESPASS** |
|         v. | |
| 25 | **6. NEGLIGENCE** |
| **PACIFICORP, INC.,** an Oregon | |
| 26  Corporation; | **7. UNLAWFUL BUSINESS PRACTICES** |
| | **(CAL. BUS. & PROF. CODE § 17200)** |
| 27          Defendant. | |
| | **JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     A.      Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

           1.      Howard McConnell. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

           2.      Leaf Hillman. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

           3.      Robert Attebury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

           4.      Frankie Joe Myers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

           5.      Terance J. Supahan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

           6.      Michael T. Hudson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

           7.      Blythe Reis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

           8.      Klamath Riverkeeper. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     B.      Defendant PacifiCorp, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV.    FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     A.      **Blue-Green Algae *Microcystis aeruginosa* and the Associated Toxin Microcystin Discharged from PacifiCorp's Operations Are Toxic.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     B.      **PacifiCorp's Dam Operations Result In Some Of The Highest Levels Of Toxic Blue Green Algae Blooms and Microcystin Recorded In A Public Waterbody.** . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     C.      **PacifiCorp Is Discharging Harmful Temperature, Dissolved Oxygen, And PH Levels From Copco And Iron Gate Dams.** . . . . . . . . . . . . . 15

     D.      **Plaintiffs Have Been And Are Being Exposed To Toxins And Adversely Affected By Pollutants Released By PacifiCorp.** . . . . . . . . . . . . 16

V.    **FIRST CLAIM FOR RELIEF (PRIVATE NUISANCE - CONTINUING) (By Plaintiffs Frankie Joe Myers, Terance J. Supahan and Blythe Reis Against PacifiCorp)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

VI.    **SECOND CLAIM FOR RELIEF (PRIVATE NUISANCE - PERMANENT) (By Plaintiffs Frankie Joe Myers, Terance J. Supahan and Blythe Reis Against PacifiCorp)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**VII.  THIRD CLAIM FOR RELIEF**
**(PUBLIC NUISANCE - CONTINUING)**
**(By All Plaintiffs Against PacifiCorp)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

**VIII.  FOURTH CLAIM FOR RELIEF**
**(PUBLIC NUISANCE - PERMANENT)**
**(By All Plaintiffs Against PacifiCorp)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

**IX.  FIFTH CLAIM FOR RELIEF**
**(TRESPASS )**
**(By Plaintiffs Frankie Joe Myers, Terance J. Supahan and Blythe Reis Against**
**PacifiCorp)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

**X.  SIXTH CLAIM FOR RELIEF**
**(NEGLIGENCE )**
**(By All Plaintiffs Against PacifiCorp)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

**XI.  SEVENTH CLAIM FOR RELIEF**
**(UNLAWFUL BUSINESS PRACTICES (CAL. BUS. & PROF. CODE § 17200)**
**(Water Pollution in Violation of Cal. Fish and Game Code § 5650))**
**(By All Plaintiffs Against PacifiCorp)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

**XII.  PRAYER FOR RELIEF** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

    **A.  On the First Claim for Relief** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

    **B.  On the Second Claim for Relief** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

    **C.  On the Third Claim for Relief** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31**

    **D.  On the Fourth Claim for Relief** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

    **E.  On the Fifth Claim for Relief:** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

    **F.  On the Sixth Claim for Relief** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **33**

    **G.  On the Seventh Claim for Relief** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **34**

    **H.  On All Claims for Relief** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **34**

**JURY DEMAND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **35**

**LIST OF EXHIBITS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **36**

Plaintiffs, by their attorneys Cotchett, Pitre & McCarthy; Lawyers for Clean Water, Inc.; and Kennedy & Madonna, LLP, allege as follows on information and belief, except as to those allegations that pertain to Plaintiffs individually, which matters Plaintiffs allege on personal knowledge:

## I.

## INTRODUCTION

1.      This case concerns the pollution and contamination of one of the greatest rivers in California.  The Klamath is one of California's largest and longest rivers, and the Lower Klamath has been part of the National Wild and Scenic Rivers System for over 25 years.  Sadly, the Klamath has also been listed as Water Quality Impaired under Section 303(d) of the federal Clean Water Act.

2.      The Klamath watershed in Northern California is the historic home of the Yurok and Karuk tribes.  For hundreds of years, the Klamath has been integral to the tribe members' cultural, religious, economic and family lives. Generations of Yurok and Karuk children have played next to and swam in the Klamath, and their parents fish and practice religious rites in the river.  Many of these families rely on sales of salmon for their economic survival.

3.       The Klamath has always been an important fish spawning passage, once supporting the third largest salmon runs on the West Coast.  Under federal law, the Yurok tribespeople have the right to sufficient salmon to support a modest standard of living.  It is as true today as it was a century ago, when our United States Supreme Court stated about the right of indigenous people to fish:

**The right to resort to the fishing places [is] not much less necessary to [their] existence . . . than the atmosphere they breathe[.]**

*United States v. Winans*, 198 U.S. 371, 381, 25 S.Ct. 662, 49 L.Ed. 1089 (1905).

4.      The Klamath has independent economic, scientific, scenic, and recreational value to others, as well.  California's commercial fishing economy relies heavily on the Pacific salmon catch, as does the Klamath sport fishing industry.  Recreational uses such as whitewater rafting

1  and kayaking have made the Klamath a popular destination for river sports enthusiasts, as well.

2  Others enjoy the beauty of this California scenic treasure when hiking, birdwatching, and

3  observing wildlife.

4       5.     Over the past eight decades, dams have been erected on the Klamath.  Today,

5  defendant PacifiCorp owns and operates those dams.  The dams harm the Klamath River

6  environment, in that they disrupt water flows and raise water temperatures, resulting in the

7  growth of a toxic blue-green algae called *Microcystis aeruginosa*, a species of cyanobacteria.

8  Toxins released from that algae's blooms have significantly reduced the Klamath fishery

9  population, limiting both the tribe members' and the commercial fishermen's catch and

10  jeopardizing their economic survival.  The same toxic blooms make the water unsightly and

11  unsafe, deterring river recreation and the associated Northern California businesses.  Attached

12  hereto as Exhibit A is a map by the United States Department of the Interior - Bureau of

13  Reclaimation showing the locations of the dams on the Klamath River.

14       6.     It has now been documented that the pollution and contamination have their

15  origins in reservoirs that sit above PacifiCorp's Iron Gate and Copco dams.  PacifiCorp's

16  operation of the dams raises water temperatures in the reservoirs well above natural levels, and

17  reduces dissolved oxygen levels to levels lethal to fish. Those elevated temperatures also

18  promote the algae's growth, so much so that a layer of toxic scum now covers the reservoirs from

19  July through October.  ***The algae's effects go far beyond diminished aesthetic value; it poses a***

20  ***threat to the fishery and human health, because it generates a potent liver toxin and tumor***

21  ***promoter known as a microcystin***.

22       7.     PacifiCorp's discharges of pollutants and polluted water from the Copco and Iron

23  Gate dams expose Plaintiffs, their customers, and the public to toxins, reduces the Plaintiffs'

24  property values, and severely impacts fish stocks in the Klamath, its tributaries, and the

25  California and Oregon coasts.  As a result, Plaintiffs' and/or their customers' ability to been

26  reduced and in some cases, eliminated, causing damages to each.

27  / / /

28  / / /



LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

COMPLAINT              2

8.    PacifiCorp has so devastated the fish population through its Klamath operations that in January of 2007, the National Marine Fisheries Service ordered PacifiCorp to make significant modifications to the dams to facilitate salmon migration to spawning waters as part of the federal government's pending reauthorization of the dams.  *See* Blaine Harden, "U.S. Orders Modification of Klamath River Dams," Washington Post, January 31, 2007 (Exhibit B).

## II.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) because the amount in controversy exceeds $ 75,000.00 exclusive of interests and costs, and because this is an action by plaintiffs who are residents of a different state from the defendant.

10.    PacifiCorp is an Oregon corporation that has its principal place of business at 825 Northeast Multnomah, Suite 2000, Portland, Oregon 97232.  Therefore, PacifiCorp is a citizen of Oregon for purposes of determining whether diversity jurisdiction exists.

11.    All of the Plaintiffs are individuals who are citizens of the State of California.

12.    The amount in controversy exceeds $75,000.00. Therefore this Court has original jurisdiction in this action.

13.    Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(a)(2), in that a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.  Specifically, the Klamath runs through Humboldt County, which is in this District.  Among the Plaintiffs whose real property and/or business values have been diminished because of the toxic algae PacifiCorp has caused to proliferate are Howard McConnell of Hoopa, Humboldt County, California; Leaf Hillman, Terance J. Supahan, and Blythe Reis of Orleans, Humboldt County, California;and Frankie Joe Myers of Weitchpec, Humboldt County, California.  In addition, Plaintiff Klamath Riverkeeper has its principal place of business in this District in Orleans, Humboldt County, California.

/ / /

/ / /

# III.

# THE PARTIES

**A.     Plaintiffs.**

**1.     Howard McConnell.**

14.     Howard McConnell is a Yurok tribal elder and a former chairman of the Yurok Tribal Council.  He resides in Hoopa, California.  Mr. McConnell is a Yurok fishermen and has fished the Klamath River for salmon, steelhead, sturgeon, and lamprey eel from the Klamath all of his life.  His federal fishing rights derive from those Congress has given to the Yurok tribe.  Mr. McConnell's livelihood is threatened by the declining fishery, and he is exposed to water pollutants when fishing the Klamath River.

**2.     Leaf Hillman.**

15.     Leaf Hillman is a member of the Karuk Tribe and is a lifelong resident of Orleans, California. Mr. Hillman is currently the Vice chairman of the Karuk Tribal Council.  In addition, Mr. Hillman is a world renewal priest, having inherited the responsibility to preside over and organize a series of traditional Karuk religious ceremonies known as Pikiawish.  Translated into English, Pikiawish means "to fix the world".  Pikiawish ceremonies are performed by world renewal priests in the Klamath River during late summer or early fall as dictated by a lunar calendar.  The severe decline of the Klamath fishery impacts the ceremonies for which Mr. Hillman is responsible, for as fish are an integral part of those Karuk ceremonial practices.  When he conducts and participates in Pikiawish ceremonies, Mr. Hillman is immersed in  water that has been polluted with algal microcystin because of PacifiCorp's activities.  The hazard to Mr. Hillman's health is particularly extreme, in that the Pikiawish ceremony  coincides with or closely follows peak algae blooms in the Copco and Iron Gate reservoirs, when pollution of the Klamath is at its worst.

**3.     Robert Attebury.**

16.     Robert Attebury is a member of the Yurok tribe and resides in Happy Camp, California.  In 2006, Mr. Attebury served as a world renewal priest during Pikiawish.  In the course of the ceremony, Priests bath ritualistically in the Klamath River several times a day.

Therefore, world renewal priests are especially susceptible to exposure to water pollutants. Several days into last year's Pikiawish ceremony, Mr. Attebury became ill and was forced to end his service as priest prematurely.

**4.   Frankie Joe Myers.**

17.   Frankie Joe Myers is a member of the Yurok Tribe.  He owns land adjacent to the Klamath River in Weitchpec, California, where he lives with his wife and child.  Mr. Myers's father is a member of the Yurok Tribal council.  Mr. Myers fishes in the Klamath River, and is thereby exposed to water pollutants.  His federal fishing rights derive from those Congress has given to the Yurok tribe.  As swimming is a primary source of family recreation for river communities, Mr. Myers's family is exposed to water pollutants when swimming and recreating.

**5.   Terance J. Supahan.**

18.   Terance J. Supahan is a member of the Karuk Tribe and resides in Orleans, California. Mr. Supahan owns and resides on land adjacent to the Klamath River. Mr. Supahan is a cultural practitioner, participating in Pikiawish and other traditional Karuk ceremonies. Through participation in ceremonies and recreating in the river, Mr. Supahan is exposed to water pollutants.

**6.   Michael T. Hudson.**

19.   Michael T. Hudson is a commercial fisherman who resides in Berkeley, Alameda County, California, and operates a commercial fishing vessel from Half Moon Bay, San Mateo County, California.  Mr. Hudson is President of the Small Boat Commercial Salmon Fishermen's Association and is also a Director of the Pacific Coast Federation of Fishermen's Associations ("PCFFA").  The declines in Klamath River salmon has resulted in a reduced ocean salmon fishery population, and has caused Mr. Hudson to suffer economic loss and damages.

**7.   Blythe Reis.**

20.   Blythe Reis resides in Orleans, California, where she co-owns and operates the Sandy Bar Ranch.  The Sandy Bar Ranch provides cabin rentals for fishermen, kayakers, rafters, and other visitors to the area.  Mrs. Reis's customers are exposed to water pollutants through

various forms of river recreation.  PacifiCorp's pollution of the Klamath threatens Ms. Reis's livelihood, as it deters recreational uses of the river.

**8.    Klamath Riverkeeper.**

21.    Klamath Forest Alliance ("Riverkeeper") is a nonprofit public benefit corporation organized under the laws of the State of California with its main office in Orleans.  It operates the Klamath Riverkeeper project, whose mission is to preserve, protect, and defend the environment, wildlife and natural resources of the Klamath River.  Riverkeeper's members recreate throughout the Klamath River watershed, using the area waterways and riparian lands to fish, sail, boat, kayak, swim, birdwatch, view wildlife, and engage in scientific study, including monitoring activities.  The water pollution that results from the Klamath dams' operations impairs these uses.  Thus, the interests of Riverkeeper's members have been, are being, and will continue to be adversely affected and irreparably harmed by the conduct alleged herein.  Riverkeeper's members have no plain, speedy, and adequate remedy at law for those harms.  The relief sought herein will redress the harm to Riverkeeper's members caused by defendant's activities.

**B.    Defendant PacifiCorp, Inc.**

19.    PacifiCorp., Inc. ("PacifiCorp") is a corporation organized under the laws of the State of Oregon.  Among other business activities, PacifiCorp operates dams on the Klamath River in California and Oregon.  PacifiCorp is headquartered in Portland, Oregon.  PacifiCorp has over 1.6 million retail electricity customers, 43,777 of whom are in California.

22.    In March of 2006, PacifiCorp was acquired by MidAmerican Energy holdings Company.  MidAmerican Energy has operating revenues of $10.3 Billion annually and is owned in whole or in part by Berkshire Hathaway.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /



**IV.**

**FACTS**

**A.      Blue-Green Algae** *Microcystis aeruginosa* **and the Associated Toxin Microcystin Discharged from PacifiCorp's Operations Are Toxic.**

23.      Concern over habitat destruction and disruption of native fisheries from dams on the vast majority of the rivers of the west coast of the United States has steadily increased over several decades.  Another, even more insidious impact of those dams has come to light in recent years.  Many of the dams, such as the Iron Gate and Copco dams owned and operated by PacifiCorp, and their resulting reservoirs are toxic, blue-green algae factories.  By damming rivers that are high in nutrients, impounding the waters in reservoirs, then warming those waters in a quiescent environment, dam operators like PacifiCorp create a perfect environment for the growth and proliferation of blue-green algae, also known as cyanobacteria.  *Microcystis aeruginosa* proliferate in the Iron Gate and Copco dams, and are at peak bloom in July and August.  The algal blooms generate a microcystin that is both a potent liver toxin and a tumor promoter.

24.      In 2006, microcystin levels in the Copco and Iron Gate reservoirs exceed World Health Organization guidelines for a *moderate* risk of exposure 4,000 times over, and were the highest levels of that toxic ever measured in the United States.  Water from these toxic pools flows down the Klamath and through tribal lands, jeopardizing all downstream uses of the river.

25.      The algae degrades water quality, imperiling the Klamath's salmon, steelhead, sturgeon and lamprey fisheries.  When the algae breaks up, the resulting sediment provides an ideal incubator for worms that host the *C. Shasta* parasite.  That parasite has been linked to juvenile salmon die-offs in the Klamath for each of the past five years.

26.      Many genera of cyanobacteria produce a variety of neuorotoxins, liver toxins (hepatotoxins) and other toxins poisonous to both humans and wildlife.  While an algae cell remains healthy, toxins will remain within the cell.  Under certain growth conditions, healthy algal cells secrete toxins.  As the algae cells age, die or break open (such as occurs when algaecides are applied), the cells release their toxins into the water.

27.     *Microcystis aeruginosa* ("*M. aeruginosa*") is one such cyanobacteria.  When present, *M. aeruginosa* is found on and near the surface of relatively still lakes and reservoirs, appearing as mats of scum and giving the water a green-hue.  This blue-green algae produces the potent toxin microcystin.  Microcystin is a hepatotoxin, the liver being its ultimate target.

28.     Microcystins are highly toxic at very low dosages.  Exposure to *M. aeruginosa* and microcystin occurs through oral ingestion, aspiration of water into the lungs, inhalation of mist and skin contact.  Stone, David and William Bress, "Addressing Public Health Risk For Cyanobacteria in Recreational Freshwaters:  The Oregon and Vermont Framework," Integrated Envt'l Assess. & Management, Vol. 3, No. 1, p. 139 (2007) ("Stone & Bress") (Exhibit C).  Exposure can result in serious gastrointestinal problems, nausea, vomiting, flu-like symptoms, sore throat, blistering, eye and ear irritations, rashes, visual disturbances and death through liver failure.  *Id.* at p. 137.  Exposure to toxin can be exacerbated by eager recreational users entering the water shortly after a bloom has dissipated.  *Id.*  at p. 142.  In addition, because the death of the *M. aeruginosa* releases its toxins into the surrounding waters, released toxins will persist after a blue-green algae bloom dissipates.  *Id.* at p. 142.

29.     Microcystin can accumulate in fish tissue.  *Id.*  Microcystin has been measured not only in the livers and viscera of exposed fish, but also in their fillets.  *Id.*  Cooking fish or heating water does not break down microcystins.  *Id.* at pp. 139-140.

30.     The World Health Organization ("WHO") has established several standards for cyanobacterial levels based on various risk levels.  WHO has published a provisional drinking water guideline value of 1 microgram per liter (µg/l) for microcystin-LR.  Chorus, Ingrid & Jamie Bartram, eds., Toxic Cyanobacteria In Water: A Guide To Their Public Health Consequences, Monitoring And Management, § 5.2.2 (World Health Organization 1999) ("WHO Guide") (Exhibit D).  WHO has established a low risk level of 20,000 cyanobacterial cells per milliliter (cells/ml).  *Id.*  At that level, data indicates that exposed individuals may still experience skin irritation and gastrointestinal illness.  WHO's moderate probability of health effect threshold is set at 100,000 cyanobacterial cells/ml.  *Id.*  According to WHO, more long-term illnesses could result from exposure at this level, in addition to skin irritation and

gastrointestinal illness.  WHO published a tolerable daily intake ("TDI") value of .04 μg kg bw-1

corresponding to the amount of potentially harmful substances that can be consumed daily over a

lifetime with negligible risk of adverse health effects.  *Id.*

31.     WHO also sets a high risk level when algal scums are present, which can increase

cell densities a 1000 to 1,000,000 fold and where whole body exposure to or ingestion or

aspiration of any cyanobacteria scum may occur.  *Id.*  When a person or animal is exposed to

cyanobacterial scum, there is a potential for acute poisoning and even death.  "It has been

calculated that a child playing in a Microcystis scum for a protracted period and ingesting a

significant volume could receive a lethal exposure.  . . ."  *Id.*

32.     The State of Oregon has employed a guidance level for *M. aeruginosa* and

microcystin of 40,000 cells/ml and 8 μg/l, respectively.  Stone & Bress at p. 142 (Exhibit C).

Levels of *M. aeruginosa* and microcystin measured in Copco and Iron Gate reservoirs during

2005 and 2006 greatly exceed the health-based standards published by WHO and the State of

Oregon.

**B.     PacifiCorp's Dam Operations Result In Some Of The Highest Levels Of
Toxic Blue Green Algae Blooms and Microcystin Recorded In A Public
Waterbody.**

33.     For at least the last six years, PacifiCorp has been aware of excessive algal blooms

occurring behind the Copco and Iron Gate Reservoirs, particularly during the summer and early

fall months.  *See* Kann, Jacob, "Microcystis aeruginosa Occurrence in the Klamath River System

of Southern Oregon and Northern California," p. 12 (Feb. 3, 2006) ("Kann 2006") (Exhibit E);

Letter from Russ J. Kanz, Environmental Specialist, State Water Resources Control Board to

Magalie R. Salas, Federal Energy Regulatory Commission, at p. 11 (Apr. 22, 2004) (noting the

presence of "offensive algal blooms and associated odors" in the reservoirs) (Exhibit F);  Karuk

Tribe of California Submission to FERC, Recommended Terms and Conditions, Klamath

Hydroelectric Project at p. 7 (March 28, 2006) ("Karuk Terms") (Exhibit G).

34.     Data collected by PacifiCorp and the Karuk Tribe Department of Natural

Resources over the last six years demonstrates the occurrence of dangerous *M. aeruginosa*

blooms in the Copco and Iron Gate Reservoirs despite the absence of detectable levels of that algae in Klamath River water samples above Copco Reservoir.  Kann 2006 at p. 12 ("Copco/Irongate reservoir system showed significant prevalence of [*M. aeruginosa*], especially relative to Klamath River stations directly above the reservoirs"); *Id.* at p. 15 ("both the PacifiCorp and Karuk/SWRB data clearly indicate large increases in [*M. aeruginosa*] in the reservoirs relative to the Klamath River upstream") (Exhibit E).

35.     Analyses of a water sample taken from Copco Reservoir by the Klamath Basin Tribal Water Quality Workgroup in September 2004 confirmed the presence of *M. aeruginosa* and its accompanying toxin microcystin in that reservoir.  Subsequently, in 2005 and 2006, the Karuk Tribe Department of Natural Resources carried out comprehensive monitoring of both reservoirs for the presence of cyanobacteria and microcystin, again finding very high levels of *M. aeruginosa* within the reservoirs and no *M. aeruginosa* and very low or no levels of microcystin directly above the reservoirs.

36.     PacifiCorp conducted algae sampling in Copco and Iron Gate Reservoirs from 2001 to 2004.  Kann 2006 at p. 9 (Table 2) (Exhibit E).  Almost all of PacifiCorp's samples were taken at various depths, ranging from an integrated sample extending down to 10 meters or a grab sample at various depths from 0.5 meters to 8 meters.  *Id.* at p. 12.  *See also* Kann, Jacob and Asarian, Eli, "Technical Memorandum: Longitudinal Analysis of Klamath River Phytoplankton Data 2001-2004," at p. 1 (Sept. 2006) ("Kann & Asarian 2006") (Exhibit H).

37.     Because *M. aeruginosa* floats and concentrates near the surface of waterbodies, PacifiCorp's data would underestimate the concentrations of algae at the surface of the reservoirs where water contact recreation would occur.  *See* Kann & Asarian 2006 at p. 16 (Exhibit H); Kann, Jacob, "Partial Seasonal Summary of 2006 Toxic Microcystis aeruginosa Trends in Copco and Iron Gate Reservoirs and the Klamath River CA," p. 12 (Nov. 2006) ("Kann 2006a") (Exhibit I).

38.     Nevertheless, from July through October of the sampling period, 30% of the 13 samples taken by PacifiCorp from Copco Reservoir showed detectable levels of *M. aeruginosa* with 5 of those samples containing greater than 10,000 cell/ml of *M. aeruginosa*.  *Id.* at p. 9

(Table 2).  Similarly, despite being taken at depth, 29% of the 12 samples taken from Iron Gate reservoir showed the presence of *M. aeruginosa* with 2 of those samples above 10,000 cell/ml. *Id*.  Notably, on the two occasions where PacifiCorp directly sampled the surface of the reservoirs where blooms were present contained extremely high levels of *M. aeruginosa*. Specifically, a 2003 sample taken at Copco reservoir contained 18 million cells/ml, or approximately 20,000 colonies per milliliter (colonies/ml), and a 2005 sample contained 6.6 million cells/ml. *Id.* at p. 12.

39.     In 2005, the Karuk Tribe Department of Natural Resources took samples from various locations in the two reservoirs.  Kann, Jacob and Corum, Susan, "Summary of 2005 Toxic Microcystis aeruginosa Trends in Copco and Iron Gate Reservoirs on the Klamath River, CA" at pp. 3-4 (March 2006) ("Kann & Corum 2006") (Exhibit J).  The sampling locations were designed to monitor various conditions and key locations within the reservoirs including open water, calm shoreline areas and some shorelines adjacent to popular boat launch areas and residences.  *Id*.  Samples were taken bi-weekly beginning in July 2005 and concluding at the beginning of November 2005.  *Id.* at p. 3, 7-9 (Table 2).

40.     Beginning in July 2005, Dr. Kann and Ms. Corum measured levels of *M. aeruginosa* and microcystin well-above the standards published by WHO and the State of Oregon.  Cell counts of *M. aeruginosa* and levels of microcystin increased as the summer progressed, peaking in September at a cell count of 163 million *M. aeruginosa* cells per milliliter and 1994.83 milligrams per liter of microcystin along the western shoreline of Copco Reservoir. Those levels exceeded the WHO moderate risk levels for *M. aeruginosa* and microcystin by 1,630 times and 99.7 times, respectively.  Kann & Corum at p. 8 (Table 2) (Exhibit J).

41.     Dr. Kann and Ms. Corum detected high levels of *M. aeruginosa* and microcystin in both reservoirs from July through the end of October 2005.  Although those levels exhibited variability both temporally and spatially, levels of *M. aeruginosa* and microcystin at most of the reservoir monitoring stations exceeded WHO's moderate risk levels for the vast majority of days samples were taken from August through October.  *Id.* at p. 12.

/ / /

42.     The Karuk Tribe Department of Natural Resources continued water sampling in 2006.  Blooms of *M. aeruginosa* once again were observed beginning in mid-July.  Levels of *M. aeruginosa* and microcystin were extremely high as soon as the blooms appeared.  On July 13, 2006, Dr. Kann measured 11 million cells of *M. aeruginosa* per ml and an accompanying microcystin level of 2,286 µg/l in Copco Reservoir.  Kann 2006a at p. 4 (Exhibit I).  That level of *M. aeruginosa* was over 100 times the WHO moderate risk level and the microcystin concentration was over 300 times greater than the tolerable daily intake level published by WHO for a 40 pound child.  *Id.* at p. 6 (Table 2).

43.     Similar levels of *M. aeruginosa* were detected throughout the summer and into October of 2006, with a maximum level of *M. aeruginosa* of 393,395,000 cells/ml,  which is 3,934 times the WHO moderate health risk, measured on July 27, 2006.  *Id.*

44.     Microcystin results were still pending at the time of Dr. Kann's November 2006 report.  However, the data for the summer months also showed consistently high levels of the toxin, with a maximum concentration of 12,176 µg/l measured on August 8, 2006.  That concentration was 1,682 times the TDI level for posting adopted by the State of Oregon and the Klamath Basin Blue-Green Algae Working Group.  *Id.*  The levels of microcystin measured in July and August 2006 were in fact the highest levels ever recorded in the two reservoirs and "among the highest recorded in the world." *Id.* at p. 5.

45.     There can be no dispute about the causal connection of PacifiCorp's operations to the toxic pollution in the Lower Klamath.

46.     Although showing extremely high levels of *M. aeruginosa* and microcystin within the two reservoirs in 2005 and 2006, Bureau of Reclamation's sampling of Klamath River waters released from Upper Klamath Lake, as well as Dr. Kann's and Ms. Corum's sampling from just above Copco Reservoir show very low levels of the algae and associated toxin.

47.     Indeed, in 2005, no *M. aeruginosa* was detected in any of the samples of Klamath River water flowing into Copco Reservoir.  Kann & Corum at p. 13 (Exhibit J).

48.     A similar pattern of no detectable levels of *M. aeruginosa* also was observed in 2006.  Microcystin was either not detected or present at very low levels.  Kann 2006a at pp. 6-8

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

(Table 2) ("KRAC" *i.e.* "Klamath River Above Copco" monitoring station; some microcystin data for September and October was pending at time of report) (Exhibit I); *Id.* at pp. 12-13.

49.    Likewise, *M. aeruginosa* was detected in only two of seventeen samples PacifiCorp itself collected above Copco Reservoir during the months of July through October and the years 2001 through 2004. Kann 2006 at p. 12 (Exhibit E). The highest level detected by PacifiCorp during that period was 30 colonies/ml. *Id.*

50.    By contrast, in 2005 Dr. Kann and Ms. Corum measured levels of *M. aeruginosa* in five of seven samples taken below Iron Gate Dam (that is, after the Klamath waters passed through the Copco and Iron Gate Reservoirs, detecting a high of 42,577 cells/ml of *M. aeruginosa* on September 8, 2005. Kann & Corum at pp. 7-9 (Table 2) (Exhibit J).

51.    Data regarding microcystin levels was limited in 2005. *Id.* Nevertheless, with the exception of one very low level of microcystin detected at the outflow from Upper Klamath Lake, no microcystin was detected in samples taken above Copco Reservoir. *Id.* at p. 13. Low levels of microcystin were detected just below Iron Gate Dam in late September and early October of 2005. *Id.*

52.    Six of nine samples taken below Iron Gate Dam in 2006 showed measurable levels of *M. aeruginosa* , including a high of 35,985 cells/ml discharging to downstream waters from Iron Gate on July 27, 2006. Kann 2006a at p. 6 (Table 2) (Exhibit I). Microcystin also was detected in the 2006 releases from Iron Gate Dam. *Id.* at pp. 6-7.

53.    Additional data for Upper Klamath Lake does not show any appreciable amounts of *M. aeruginosa* passed downstream from the waterbody.

54.    Dr. Kann analyzed data of *M. aeruginosa* densities collected by the Klamath Tribes from 1990-1997 in Upper Klamath Lake and Agency Lake (upstream of Klamath Lake). Kann 2006 at pp. 2-7 (Exhibit E). During the July through October period for the entire eight years of data collected by the Klamath Tribe, only 13 of 537 samples exceeded one colony of *M. aeruginosa* per milliliter. *Id.* at p. 7. Although *M. aeruginosa* were present in Upper Klamath Lake, detected in about 13% of the Klamath Tribe samples, the levels were almost always below 1 colony/ml. *Id.* Levels leaving Upper Klamath Lake also were very low.

55.     PacifiCorp data from 19 samples taken during July through October in 2001 to 2004 in the Klamath River below Upper Klamath Lake at the mouth of the Link River did not detect any *M. aeruginosa*. *Id.* at p. 12.

56.     These samplings make it clear that it is the Copco and Iron Gate Reservoirs that are generating massive quantities and concentrations of *M. aeruginosa* and microcystin. Dr. Kann cites to multiple lines of evidence pointing to the role of PacifiCorp's reservoirs in creating ideal habitat conditions for *M. aeruginosa*. Kann 2006 at pp. 18-19 (Exhibit E). But for the operation of the two reservoirs, including their stilling and warming of Klamath River waters, little if any of the *M. aeruginosa* and accompanying microcystin detected in and downstream of the reservoirs would be present. *See* Karuk Terms at pp. 7-8 (Exhibit G); FERC Draft Environmental Impact Statement for the Klamath Hydroelectric Project, Section 3 at p. 3-153 ("DEIS") (Exhibit K).

57.     As Dr. Kann concludes, "[t]aken together these data provide compelling evidence that Copco and Iron Gate Reservoirs are providing ideal habitat for MSAE [microcystin]; increasing concentrations dramatically from those upstream, and exporting MSAE to the downstream environment." Kann 2006 at p. 19 (Exhibit E).

58.     Likewise, Dr. Kann and Mr. Asarian concluded that:

> these analyses show that although the Klamath River receives a large loading of algal biomass (made up largely of the cyanophyte, APHA [aphanizomenon]) from UKL [Upper Klamath Lake], the analyzed data provide clear evidence that Copco and Iron Gate Reservoirs are providing habitat conditions that foster increased overall phytoplankton biovolume comprised largely of nitrogen-fixing cyanophyte species as well as toxigenic [*M. aeruginosa*].

Kann & Asarian 2006 at p. 34 (Exhibit H); *see also* WHO Guide at p. 14, § 1.1 ("[b]y increasing retention times and surface areas exposed to sunlight, impoundments change the growth conditions for organisms and promote opportunities for cyanobacterial growth and water-bloom formation through modifications to river discharges") (Exhibit D).

/ / /

/ / /

/ / /

**C.   PacifiCorp Is Discharging Harmful Temperature, Dissolved Oxygen, And
PH Levels From Copco And Iron Gate Dams.**

59.   In addition to discharging dangerous levels of *M. aeruginosa* and microcystin,
PacifiCorp's operations result in the discharge of levels of temperature, dissolved oxygen and pH
that are harmful to the beneficial uses of the Klamath River.  The State of California and United
States Environmental Protection Agency have identified the Klamath River as impaired by
temperature and low dissolved oxygen (as well as nutrients), and the impacts of PacifiCorp's
discharges on the aquatic environment are well documented.  *See* 2002 Section 303(d) List of
Water Quality Limited Segments, at p. 9 (North Coast Regional Board, approved by EPA July
2003) (http://www.swrcb.ca.gov/tmdl/docs/2002reg1303dlist.pdf) ("303(d) List").

60.   PacifiCorp is discharging both low and high levels of temperature from its dam
operations that are detrimental to anadromous fish of the Klamath River, including but not
limited to Chinook salmon.  The effects of PacifiCorp's temperature discharges can be easily
discerned by PacifiCorp's own monitoring at least 50 miles downstream.  DEIS at p. 3-136
(Exhibit K).

61.   In the fall, PacifiCorp's discharges include high temperature waters that are
detrimental to the spawning of fall run Chinook.  Although the temperature of the Klamath River
during the summer would not be ideal for spawning salmon even without the presence of
PacifiCorp's hydroelectric project, according to PacifiCorp's temperature modeling, acceptable
river temperatures normally would be reached by early September in time for the natural
spawning timing of the native fall run Chinook salmon.  Karuk Terms at p. 10 (Exhibit G).
PacifiCorp's dams and reservoirs delay the cooling of the Klamath's waters for at least three
weeks.  *Id*.  PacifiCorp's delaying of cooler fall waters in the Klamath is the likely cause of a
corresponding, approximate three-week delay of spawning by fall run Chinook salmon in the
Klamath below Iron Gate Dam.  *Id.* at p. 12.  That delay leads to additional stresses on the fish,
including unnatural competition and contact with other runs of fish in the lower Klamath River.
*Id*.

/ / /

62. In the spring, PacifiCorp discharges colder water from Iron Gate Dam than would naturally occur. Karuk Terms at p. 9 (Exhibit G). By unnaturally maintaining cooler waters in the Klamath River below Iron Gate Dam, PacifiCorp stunts the growth rate of juvenile salmon preparing to out-migrate. *Id*. Smaller juvenile fish progress more slowly downriver, prolonging their exposure to stresses within the river, including parasites and predators. *Id*. As a result, the smaller fish resulting from PacifiCorp's discharge of cold water in the spring have a smaller chance of surviving their migration out to sea and ultimately returning to spawn in the Klamath River. *Id.*

63. PacifiCorp's discharges of water containing low levels of dissolved oxygen ("DO") are also well documented. "[FERC's] review of available DO data and modeling results from downstream of Iron Gate dam indicates that during the warmer months of the year, project operations results in DO that does not meet applicable water quality objectives." DEIS at p. 3-141 (Exhibit K). Discharges from Iron Gate Dam during the summer months frequently dip below 6 mg/l of dissolved oxygen, well below the minimum level deemed necessary to avoid stresses on salmon. Karuk Terms at p. 29 (Exhibit G).

64. The lower depths of PacifiCorp's reservoirs are hypoxic during the summer. For example, the bottom 50 feet of Iron Gate Reservoir are hypoxic during the summer months. *In* addition, large quantities of algae in the reservoirs also consume oxygen. *See* Karuk Terms at p. 31 (Exhibit G).

65. Inflated pH levels also result from PacifiCorp's operation. pH levels of 8.5 are stressful to salmon and levels above 9.6 kill salmon. Karuk Terms at p. 32 (Exhibit G). PacifiCorp frequently releases very high pH levels exceeding 8.5 in water from Iron Gate Dam. *Id*. Salmon exposed to these high pH levels are stressed.

**D.**  **Plaintiffs Have Been And Are Being Exposed To Toxins And Adversely Affected By Pollutants Released By PacifiCorp.**

66. PacifiCorp's introduction of excessive levels of *M. aeruginosa* and microcystin to the Klamath River as it passes through their hydroelectric dams and reservoirs exposes Plaintiffs, their members and the general public to dangerous levels of toxins, significantly impairs their

1  ceremonial, recreational, and aesthetic uses of the river and could adversely affect their

2  livelihoods and their health.

3       67.    Plaintiffs and their members regularly use the waters of the Klamath River, both

4  below the Iron Gate and Copco reservoirs and while it passes through the reservoirs. The Karuk

5  Tribe is a federally recognized tribe with ancestral homelands bisected by the Klamath River.

6  Historically, the Karuk occupied over 90 villages along the Klamath and Salmon Rivers, with

7  fisheries associated with each. Today, the Karuk fishery is limited to a ceremonial and

8  subsistence dip net fishery at Ishi Pishi Falls near Somes Bar, California.

9       68.    Degradation of fisheries in the Klamath River from PacifiCorp's discharges of

10  low or high temperature water, low dissolved oxygen and high pH also have detrimental impacts

11  on the salmon that are integral to the Karuk Tribe's cultural, religious and subsistence practices.

12       69.    In addition to direct exposure to microcystin through fishing, Karuk ceremonial

13  leaders are exposed to the toxin while conducting and participating in religious and cultural

14  ceremonies. For example, the Pikiowish, or World Renewal, ceremonies are conducted in

15  accordance to a lunar calendar, but are typically held from early August to early September. The

16  ceremonies require priests and practitioners to bathe ritualistically in the Klamath river for days

17  at a time. The ceremony coincides with the blooms of *M. aeruginosa* in PacifCorp's upstream

18  reservoirs. Karuk ceremonial leaders and participants face a heightened risk of adverse health

19  impacts from performing these religious rites. Indeed, PacifiCorp's conduct endangers the health

20  of any tribe member or priest who participates in river-based religious ceremonies, threatening

21  the Karuk tribe with cultural extinction.

22       70.    Like PCFFA's other commercial fishing members , Mr. Hudson makes his

23  livelihood harvesting and marketing salmon from the Klamath River, including harvesting

24  hatchery fish reared just below Iron Gate Dam at Iron Gate Hatchery, by which activities these

25  fish are introduced into the chain of commerce for consumption by the general public. Any trace

26  of these toxins in commercially sold fish could devastate consumer confidence in this food

27  source and destroy the markets for that salmon.

28  / / /

71.     PacifiCorp's operations also result in an unsightly green tint to vast expanses of both the Copco and Iron Gate Reservoirs. *See*, *e.g.* Kann 2006a at p. 9 (Exhibit I). The discoloration of the waters of the Klamath River violates the Basin Plan's narrative standard for color and degrades Plaintiffs' and the public's enjoyment of the river as it passes through the reservoirs.

72.     PacifiCorp's operations result in unsightly floating scum within the two reservoirs, also impairing Plaintiffs' and the public's aesthetic enjoyment of the Klamath River as it passes through PacifiCorp's operations.

73.     PacifiCorp's introduction of excessive levels of *M. aeruginosa* and microcystin into the waters of the Klamath River have made those waters effectively unusable by Plaintiffs and the public from July through October. Levels of *M. aeruginosa* and microcystin measured in Copco and Iron Gate reservoirs during that four-month period are consistently well above the moderate risk health standards set by the World Health Organization. The levels also consistently exceeded TDI and posting levels established by the State of Oregon. Dr. Kann, applying the WHO and State of Oregon standards, concludes that:

> [M. aeruginosa] bloom conditions in Copco and Iron Gate Reservoirs in 2006 represented a clear public health risk with respect to water contact recreation. Maximum [M. aeruginosa] cell density and microcystin concentrations measured in 2006 were higher than those in 2005, and were among the highest reported in the literature (e.g., Chorus and Bartram 1999). The maximum microcystin value of 12,176 µg/l exceeded the 8 µg/l threshold level by 1522 times. Monitoring data in 2006 show that the 2005 conditions were not anomalous and that toxigenic blooms are likely to be a recurring phenomenon.

Kann 2006a at p. 13 (Exhibit I).

74.     As the Regional Board's Executive Officer stated in a press release issued on September 30, 2005, "The public needs to take the microcystin toxin in this algae seriously . . . The levels of algae and associated toxins measured in parts of the river are high enough to pose health risks to anyone drinking or bathing in the water, particularly children and animals." U.S. EPA Region 9 Press Release, "Federal, state and tribal authorities advise caution on dangerous Klamath River algae" (Sept. 30, 2005) (Exhibit L).

/ / /

75. Indeed, at the behest of the Regional Board and EPA, the two reservoirs have been posted with health advisories warning people to "avoid water contact on Copco and Iron Gate Reservoirs due to high levels of blue-green algae that can produce harmful toxins. . . . Children and pets are at greatest risk." Kann & Corum 2006 at p. 24 (Exhibit J). Despite the posted warnings, people may still use the reservoirs for recreation. *See id.* at p. 22 (photograph of water skier in area of active bloom).

76. In addition to those clear direct impacts to Plaintiffs, PacifiCorp's pollution emanating from the two reservoirs also poses serious threats to pets and wildlife. According to Siskiyou County public health officer Terry Barber, "[o]ccasionally domestic animals and livestock have been poisoned by toxins in the algae bloom." Siskiyou Daily News, "Health risks of blue-green algae were overstated" (Aug. 26, 2005); see Cann & Corum 2006, at p. 26 (Exhibit J). There is also anecdotal evidence from a landowner on the Copco Reservoir of one or more animal deaths in the late 1990's.

77. The levels of microcystin detected in the Klamath reservoirs also indicate a potential for toxin accumulation in fish tissue. Kann 2006a at p. 12 (Exhibit I). Several studies indicate that microcystin may be bioaccumulative. *See* Magalaes, V.F., *et al.*, "Microcystins (cyanobacteria hepatotoxins) bioaccumulation in fish and crustaceans from Sepetiba Bay (Brasil, RJ)" Toxicon 42 (2003); Liqiang, X. *et al.*, "Organ distribution and bioaccumulation of microcystins in freshwater fish at different trophic levels from the eutrophic Lake Chaohu, China," Envt'l Toxicology, Vol. 20, Issue 3 (2005).

78. Indeed, the Yurok Tribe's Environmental and Fisheries Programs, despite a very limited number of samples, has already detected trace levels of microcystin in steelhead livers from fish collected in the lower Klamath River. Kann 2006 at p. 18 (Exhibit E). "Although sample size is limited, low to trace quantities of microcystin in steelhead livers in the lower Klamath River indicate that these fish were exposed to toxin levels in the river environment, and indicate the potential for toxin uptake to occur." *Id.*

79. Because of their proximity to the *M. aeruginosa* blooms and residence in waters known to be high in microcystin concentrations, Plaintiffs believe the threat of microcystin

1  accumulation to be even greater rainbow trout, yellow perch, largemouth bass and other fish

2  caught and eaten by recreational anglers in Copco and Iron Gate Reservoirs.

**V.**

**FIRST CLAIM FOR RELIEF**

**(PRIVATE NUISANCE - CONTINUING)**

**(By Plaintiffs Frankie Joe Myers, Terance J. Supahan and Blythe Reis Against PacifiCorp)**

7   80.   Plaintiffs incorporate herein by this reference each of the foregoing allegations.

8   81.   Plaintiffs, and each of them, have the inalienable right to own, enjoy, and use their

9  properties without interference by PacifiCorp.

10   82.   At all times relevant herein, PacifiCorp's conduct has caused the bloom and

11  discharge into the waters of the Klamath River the algae *Microcystis aeruginosa*, the discharge

12  into the waters of the Klamath River of highly toxic microcystin associated with the algae, the

13  increase of reservoir and river water temperatures to levels harmful to the salmon fishery, and the

14  discharge into the Klamath River of water with dissolved oxygen levels harmful to salmon,

15  steelhead, sturgeon, lampreys, and other aquatic species.

16   83.   PacifiCorp's conduct as alleged herein constitutes a nuisance within the meaning

17  of Section 3479 of the California Civil Code, in that it:

18   (a)   Is injurious offensive to Plaintiffs' senses; and/or

19   (b)   Substantially and unreasonably interferes with Plaintiffs' comfortable

20  enjoyment of their properties; and/or

21   (c)   Unlawfully obstructs the free use, in the customary manner, of Plaintiffs'

22  properties including, but not limited to, all residential and commercial uses.

23   84.   Plaintiffs have been continuously damaged by the condition wrongfully created

24  and maintained by PacifiCorp.

25   85.   The contamination created by the PacifiCorp and its concomitant despoliation of

26  the waters of the Iron Gate and Copco dams, as well as the Klamath River, is a continuing

27  nuisance which adversely impacts the use and/or value of Plaintiffs' properties.

28   86.   The nuisance PacifiCorp has created can reasonably be abated.

87.     As a direct and proximate result PacifiCorp's conduct as alleged herein, Plaintiffs have suffered economic damages including, but not limited to, lost use of property, denial of useful and quiet enjoyment of property, diminution in the fair market value of property, impairment of the salability of property, and losses related to toxic contamination and pollution in the receiving waters, in an amount according to proof at trial.

88.     As a further legal result of said wrongful conduct, Plaintiffs have suffered, and will continue to suffer, discomfort, anxiety, fear, worries, and stress attendant to the interference with Plaintiffs' quiet use and enjoyment of the properties heretofore described, in an amount according to proof at trial.

89.     Until and unless enjoined and restrained by order of this Court, PacifiCorp's wrongful conduct will cause great and irreparable injury to Plaintiffs in that, *inter alia*:

(a)     The present and continuing adverse consequences of the toxic discharges caused by PacifiCorp will continue and worsen;

(b)     The damage to Plaintiffs' right to the use and enjoyment of their properties will continue and worsen; and

(c)     The reputation of the Iron Gate and Copco reservoirs, as well as the Klamath River, as contaminated water bodies posing serious risks to human heath, and with severely depleted fish stocks and fishing opportunities, will be cemented in the public's mind, permanently destroying the rural and recreational appeal of the Plaintiffs' properties.

90.     Plaintiffs have no plain, speedy, or adequate remedy at law for the injuries presently being suffered and for the aggravation of such injuries which will occur if PacifiCorp's conduct is not enjoined.  By extension, the threat of injury to Plaintiffs and the damage of the value to the Plaintiffs' properties cannot be adequately compensated by monetary damages and therefore Plaintiffs seek injunctive relief.

91.     Injunctive relief as authorized by California Code of Civil Procedure § 526 is appropriate under these facts.

92.     PacifiCorp has committed and continues to commit the wrongful acts alleged herein knowingly, maliciously and oppressively, and Plaintiffs are therefore entitled to punitive

1  and exemplary damages in an amount sufficient to punish PacifiCorp and make an example of it,

2  according to proof.

3                                                  **VI.**

4                                    **SECOND CLAIM FOR RELIEF**

5                                   **(PRIVATE NUISANCE - PERMANENT)**

6  **(By Plaintiffs Frankie Joe Myers, Terance J. Supahan and Blythe Reis Against PacifiCorp)**

7          93.     Plaintiffs incorporate herein by this reference each of the foregoing allegations.

8          94.     Plaintiffs, as herein above alleged, have the inalienable right to own, enjoy, and

9  use their properties without interference by PacifiCorp.

10         95.     At all times relevant herein, PacifiCorp's conduct has caused the bloom and

11 discharge into the waters of the Klamath River the algae *Microcystis aeruginosa*, the discharge

12 into the waters of the Klamath River of highly toxic microcystin associated with the algae, the

13 increase of reservoir and river water temperatures to levels harmful to the salmon fishery, and the

14 discharge into the Klamath River of water with dissolved oxygen levels harmful to salmon,

15 steelhead, sturgeon, lampreys, and other aquatic species.

16         96.     PacifiCorp's conduct as alleged herein constitutes a nuisance within the meaning

17 of Section 3479 of the California Civil Code, in that it:

18                 (a)     Is injurious offensive to Plaintiffs' senses; and/or

19                 (b)     Substantially and unreasonably interferes with Plaintiffs' comfortable

20 enjoyment of their properties; and/or

21                 (c)     Unlawfully obstructs the free use, in the customary manner, of Plaintiffs'

22 properties including, but not limited to, all residential and commercial uses.

23         97.     Plaintiffs are permanently damaged by the condition created by the PacifiCorp,

24 and the annual discharges from the Copco and Iron Gate dams and reservoirs is an ongoing and

25 permanent nuisance which adversely impacts the use and/or value of Plaintiffs' properties.

26         98.     As a direct and proximate result PacifiCorp's conduct as alleged herein, Plaintiffs

27 have suffered economic damages including, but not limited to, lost use of property, denial of

28 useful and quiet enjoyment of property, diminution in the fair market value of property,

1   impairment of the salability of property, and losses related to toxic contamination and pollution

2   in the receiving waters, in an amount according to proof at trial.

3       99.    As a further legal result of said wrongful conduct, Plaintiffs have suffered, and

4   will continue to suffer, discomfort, anxiety, fear, worries, and stress attendant to the interference

5   with Plaintiffs' quiet use and enjoyment of the properties heretofore described, in an amount

6   according to proof at trial.

7       100.    PacifiCorp has committed and continues to commit the wrongful acts alleged

8   herein knowingly, maliciously and oppressively, and Plaintiffs are therefore entitled to punitive

9   and exemplary damages in an amount sufficient to punish PacifiCorp and make an example of it,

10  according to proof.

## VII.

## THIRD CLAIM FOR RELIEF

## (PUBLIC NUISANCE - CONTINUING)

## (By All Plaintiffs Against PacifiCorp)

15      101.    Plaintiffs incorporate herein by this reference each of the foregoing allegations.

16      102.    Plaintiffs at all times herein mentioned had and have the inalienable right to own,

17  enjoy, and use their properties, and to not have that right impaired by the act and omissions of

18  PacifiCorp.

19      103.    At all relevant times, PacifiCorp has had a public duty to conduct its business, and

20  in particular the management of the Iron Gate and Copco dams and reservoirs in a manner that

21  does not damage the public welfare and safety.

22      104.    At all times relevant herein, PacifiCorp's conduct has caused the bloom and

23  discharge into the waters of the Klamath River the algae *Microcystis aeruginosa*, the discharge

24  into the waters of the Klamath River of highly toxic microcystin associated with the algae, the

25  increase of reservoir and river water temperatures to levels harmful to the salmon fishery, and the

26  discharge into the Klamath River of water with dissolved oxygen levels harmful to salmon,

27  steelhead, sturgeon, lampreys, and other aquatic species.

28  / / /

105. PacifiCorp's conduct as alleged herein constitutes a nuisance within the meaning of Section 3479 of the California Civil Code, in that it:

      (a)     Is injurious offensive to Plaintiffs' senses; and/or

      (b)     Substantially and unreasonably interferes with Plaintiffs' comfortable enjoyment of their properties; and/or

      (c)     Unlawfully obstructs the free use, in the customary manner, of Plaintiffs' properties including, but not limited to, all residential and commercial uses.

106. Plaintiffs have been continuously damaged by the condition wrongfully created and maintained by PacifiCorp. The contamination created by the PacifiCorp is a continuing nuisance which adversely impacts the use and/or value of Plaintiffs' properties. This nuisance can reasonably be abated.

107. As a direct and proximate result PacifiCorp's conduct as alleged herein, Plaintiffs have suffered economic damages including, but not limited to, lost use of property, denial of useful and quiet enjoyment of property, diminution in the fair market value of property, impairment of the salability of property, and losses related to toxic contamination and pollution in the receiving waters, in an amount according to proof at trial.

108. As a further legal result of said wrongful conduct, Plaintiffs have suffered, and will continue to suffer, discomfort, anxiety, fear, worries, and stress attendant to the interference with Plaintiffs' quiet use and enjoyment of the properties heretofore described, in an amount according to proof at trial.

109. PacifiCorp has committed and continues to commit the wrongful acts alleged herein knowingly, maliciously and oppressively, and Plaintiffs are therefore entitled to punitive and exemplary damages in an amount sufficient to punish PacifiCorp and make an example of it, according to proof.

110. Until and unless enjoined and restrained by order of this Court, PacifiCorp's wrongful conduct will cause great and irreparable injury to Plaintiffs in that, *inter alia*:

      (a)     The present and continuing adverse consequences of the toxic discharges caused by PacifiCorp will continue and worsen;

(b)    The damage to Plaintiffs' right to the use and enjoyment of their properties will continue and worsen; and

(c)    The reputation of the Iron Gate and Copco reservoirs, as well as the Klamath River, as contaminated water bodies posing serious risks to human heath, and with severely depleted fish stocks and fishing opportunities, will be cemented in the public's mind, permanently destroying the rural and recreational appeal of the Plaintiffs' properties.

111.    Plaintiffs have no plain, speedy, or adequate remedy at law for the injuries presently being suffered and for the aggravation of such injuries which will occur if PacifiCorp's conduct is not enjoined, in that the injury to Plaintiffs' properties and the threat of injury to Plaintiffs' health and the damage to the Sunrise Hills neighborhood can not be adequately compensated by monetary damages.

112.    Injunctive relief, authorized by Code Civ. Proc. §§ 526 and 731 is appropriate under these facts.

113.    The wrongful acts of PacifiCorp were done knowingly, maliciously, oppressively, and fraudulently, and Plaintiffs are entitled to punitive and exemplary damages in an amount to be ascertained according to proof, which is appropriate to punish or set an example of PacifiCorp.

## VIII.

## FOURTH CLAIM FOR RELIEF

## (PUBLIC NUISANCE - PERMANENT)

## (By All Plaintiffs Against PacifiCorp)

114.    Plaintiffs incorporate herein by this reference each of the foregoing allegations.

115.    Plaintiffs, as herein above alleged, have the inalienable right to own, enjoy, and use their properties without interference by PacifiCorp.

116.    At all relevant times, PacifiCorp has had a public duty to conduct its business, and in particular the management of the Iron Gate and Copco dams and reservoirs in a manner that does not damage the public welfare and safety.

/ / /

117.    At all times relevant herein, PacifiCorp's conduct has caused the bloom and discharge into the waters of the Klamath River the algae *Microcystis aeruginosa*, the discharge into the waters of the Klamath River of highly toxic microcystin associated with the algae, the increase of reservoir and river water temperatures to levels harmful to the salmon fishery, and the discharge into the Klamath River of water with dissolved oxygen levels harmful to salmon, steelhead, sturgeon, lampreys, and other aquatic species.

118.    PacifiCorp's conduct as alleged herein constitutes a nuisance within the meaning of California Civil Code § 3479, in that it is injurious and/or offensive to the senses of Plaintiffs and/or interferes with their comfortable enjoyment of their properties, and/or unlawfully obstructs the free use, in the customary manner, of Plaintiffs' properties including, but not limited to, all residential uses.  Plaintiffs have been continuously damaged by the condition wrongfully created and maintained by PacifiCorp.  The contamination created by the PacifiCorp is a continuing nuisance which adversely impacts the use and/or value of Plaintiffs' properties. This nuisance can reasonably be abated.

119.    As a direct and proximate result of said wrongful conduct, Plaintiffs have suffered economic damages including, but not limited to, lost use of property, denial of useful and quiet enjoyment of property, diminution in the fair market value of property, and losses related to toxic contamination and pollution.  Plaintiffs allege that said damages are in excess of the minimum jurisdictional amount of this Court to be set forth according to proof at trial.

120.    As a further legal result of said wrongful conduct, Plaintiffs have suffered, and will continue to suffer discomfort, anxiety fear, worries, and stress attendant to the interference with Plaintiffs' quiet use and enjoyment of the properties heretofore described, all to the Plaintiffs' general damage in an amount to be set forth according to proof.

121.    The wrongful acts of PacifiCorp were done knowingly, maliciously, oppressively, and fraudulently, and Plaintiffs are entitled to punitive and exemplary damages in an amount to be ascertained according to proof, which is appropriate to punish or set an example of PacifiCorp.

/ / /

# IX.

## FIFTH CLAIM FOR RELIEF

### (TRESPASS )

**(By Plaintiffs Frankie Joe Myers, Terance J. Supahan and Blythe Reis Against PacifiCorp)**

122.    Plaintiffs incorporate herein by this reference each of the foregoing allegations.

123.    PacifiCorp has entered upon Plaintiffs' lands without Plaintiffs' consent by way of permitting toxic microcystin under its control to escape from the Copco and Iron Gate dams, flow down the river, and enter the riparian lands and aquifers.

124.    Plaintiffs properties have been damaged as a direct and proximate result of PacifiCorp's onto Plaintiff's land.  That damage to Plaintiffs' property includes, without limitation, lost use of property, lost  profits, denial of useful and quiet enjoyment of property, diminution in the fair market value of property, and losses related to residual toxic contamination, which has caused Plaintiffs' property to be stigmatized.

125.    PacifiCorp committed the acts alleged of it maliciously and oppressively, and Plaintiffs is entitled to punitive and exemplary damages in an amount appropriate to punish PacifiCorp and make an example of it.

# X.

## SIXTH CLAIM FOR RELIEF

### (NEGLIGENCE )

**(By All Plaintiffs Against PacifiCorp)**

126.    Plaintiffs incorporate herein by this reference each of the foregoing allegations.

127.    In undertaking the operation of the Copco and Iron Gate dams and reservoirs, PacifiCorp owed a duty to Plaintiffs to conduct its activities with reasonable care and to undertake no act that would endanger the environment.  Each of PacifiCorp' activities herein alleged contributed in natural and/or continuous sequence to the creation of toxic algae and microcystin contamination in the Klamath River, and each of PacifiCorp's actions as alleged herein was a substantial factor in causing the resultant losses that Plaintiffs have suffered.

/ / /

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

128. PacifiCorp also had, and still has, a continuing obligation to protect the public welfare and its natural resources, to cease any activities that result in contamination of public waterways, and to eliminate any and all harmful consequences of that contamination. PacifiCorp also had, and still have, a duty to organize, fund and implement adequate clean up procedures, and to prevent ongoing damage to Plaintiff.

129. The blue-green algae and microcystin contamination in the Lower Klamath is not of the kind that ordinarily occurs in the absence of negligence, and was substantially caused by agencies or instrumentalities within the control of PacifiCorp.

130. At all relevant times, PacifiCorp breached its duties to Plaintiff by failing to exercise ordinary care and due diligence, in that PacifiCorp caused to be developed, and permitted to persist, the circumstances that led to the contamination of the Lower Klamath with toxic blue-green algae and microcystin.

131. Plaintiffs, and each of them, were foreseeable victims of PacifiCorp's breaches of duty of care as alleged herein.

132. At all relevant times, PacificCorp ignored their responsibilities to Plaintiff, unreasonably jeopardizing the human environment, Plaintiffs' health, and Plaintiffs' property and property values.

133. As a direct and proximate result of PacifiCorp's wrongful conduct as alleged herein, Plaintiffs have suffered economic damages, including but not limited to lost use of property, denial of useful and quiet enjoyment of property, diminution in the fair market value of property, and in the case of Robert Attebery, physical harm.

134. As a further legal result of PacifiCorp's wrongful conduct, Plaintiffs have suffered, and will continue to suffer discomfort, anxiety, fears, worries, and stress attendant to the interference with Plaintiff's quiet use and enjoyment of the property heretofore described, all to Plaintiff's general damage in an amount to be set forth according to proof at trial.

/ / /

/ / /

/ / /

# XI.

## SEVENTH CLAIM FOR RELIEF

## (UNLAWFUL BUSINESS PRACTICES (CAL. BUS. & PROF. CODE § 17200)

## (Water Pollution in Violation of Cal. Fish and Game Code § 5650))

## (By All Plaintiffs Against PacifiCorp)

135.    Plaintiffs incorporate herein by this reference each of the foregoing allegations.

136.    Section 5650 of the California Fish and Game Code prohibits discharges to waters of the State of California of any substance or material deleterious to fish, plant life, or bird life. Cal. Fish and Game Code § 5650(a)(6).

137.    PacifiCorp has discharged and continues to discharge materials deleterious to fish, plant life, and bird life in the form of *Microcystis aeruginosa algae* and Microcystin, high temperature and low temperature water, and water with extremely low levels of dissolved oxygen and high pH levels. PacifiCorp operates its dams and reservoirs in a manner that violates Section 5650 of the California Fish and Game Code.

138.    Sections 17200 through 17210 of the California Business and Professions Code prohibit unfair competition, including but not limited to operating a business in violation of California or Federal law.

139.    Section 17203 of the California Business and Professions Code provides for injunctive relief ordering compliance with State and Federal law.

140.    Section 17204 of the California Business and Professions Code provides that any person who has suffered injury in fact and has lost money or property as a result of unfair competition may bring an action for relief. Cal. Bus. & Pro. Code Section 17200-17210.

141.    Plaintiffs have suffered injury in fact, and have lost money and property value, as a result of PacifiCorp's discharges. These losses include diminished property values, loss of tourism and recreational fishing business, and loss of commercial fishing income.

142.    Plaintiffs have no plain, speedy, or adequate remedy at law for the injuries presently being suffered and for the aggravation of such injuries which will occur if PacifiCorp's

1  conduct is not enjoined, in that the injury to Plaintiffs' properties and businesses can not be

2  adequately compensated by monetary damages.

3      143.   Injunctive relief, authorized by Business and Professions Code Section 17203, is

4  appropriate under these facts.

**XII.**

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against PacifiCorp as follows:

**A.    On the First Claim for Relief:**

1.   For all economic losses suffered by Plaintiffs related to lost use of property, lost
profits, denial of quiet enjoyment and use of property, personal property damage, diminution in
the fair market value of property, and impairment of salability of property, according to proof at
trial;

2.   For general damages, in an according to proof at trial;

3.   For a permanent injunction directing PacifiCorp, its agents, servants, and
employees, and all persons acting under, in concert with, or for it, to cease operation of the Iron
Gate and Copco dams and reservoirs in a manner that causes *Microcystis aeruginosa* blooms,
discharges of toxins associated with the algae bloom, and discharges of water at temperatures and
with dissolved oxygen concentrations harmful to fish and other aquatic species;

4.   For a further permanent injunction directing PacifiCorp, its agents, servants, and
employees, and all persons acting under, in concert with, or for it, to remediate the environmental
impacts which PacifiCorp's unlawful conduct has caused;

5.   For punitive damages in an amount according to proof or taking some measure to
insure that an example is made of PacifiCorp to deter future conduct;

6.   For pre-judgment interest according to proof;

**B.    On the Second Claim for Relief:**

1.   For all economic losses suffered by Plaintiffs related to lost use of property, lost
profits, denial of quiet enjoyment and use of property, personal property damage, diminution in

28

the fair market value of property, and impairment of salability of property, according to proof at trial;

        2.      For general damages, in an according to proof at trial;

        3.      For a permanent injunction directing PacifiCorp, its agents, servants, and employees, and all persons acting under, in concert with, or for it, to cease operation of the Iron Gate and Copco dams and reservoirs in a manner that causes *Microcystis aeruginosa* blooms, discharges of toxins associated with the algae bloom, and discharges of water at temperatures and with dissolved oxygen concentrations harmful to fish and other aquatic species;

        4.      For a further permanent injunction directing PacifiCorp, its agents, servants, and employees, and all persons acting under, in concert with, or for it, to remediate the environmental impacts which PacifiCorp's unlawful conduct has caused;

        5.      For punitive damages in an amount according to proof or taking some measure to insure that an example is made of PacifiCorp to deter future conduct;

        6.      For pre-judgment interest according to proof;

**C.**    **On the Third Claim for Relief:**

        1.      For all economic losses suffered by Plaintiffs related to lost use of property, lost profits, denial of quiet enjoyment and use of property, personal property damage, diminution in the fair market value of property, and impairment of salability of property, according to proof at trial;

        2.      For general damages, in an according to proof at trial;

        3.      For a permanent injunction directing PacifiCorp, its agents, servants, and employees, and all persons acting under, in concert with, or for it, to cease operation of the Iron Gate and Copco dams and reservoirs in a manner that causes *Microcystis aeruginosa* blooms, discharges of toxins associated with the algae bloom, and discharges of water at temperatures and with dissolved oxygen concentrations harmful to fish and other aquatic species;

        4.      For a further permanent injunction directing PacifiCorp, its agents, servants, and employees, and all persons acting under, in concert with, or for it, to remediate the environmental impacts which PacifiCorp's unlawful conduct has caused;

5. For punitive damages in an amount according to proof or taking some measure to insure that an example is made of PacifiCorp to deter future conduct;

6. For pre-judgment interest according to proof;

7. For Plaintiffs' reasonable attorneys' fees pursuant to California Code of Civil Procedure § 1021.5;

**D. On the Fourth Claim for Relief:**

1. For all economic losses suffered by Plaintiffs related to lost use of property, lost profits, denial of quiet enjoyment and use of property, personal property damage, diminution in the fair market value of property, and impairment of salability of property, according to proof at trial;

2. For general damages, in an according to proof at trial;

3. For a permanent injunction directing PacifiCorp, its agents, servants, and employees, and all persons acting under, in concert with, or for it, to cease operation of the Iron Gate and Copco dams and reservoirs in a manner that causes *Microcystis aeruginosa* blooms, discharges of toxins associated with the algae bloom, and discharges of water at temperatures and with dissolved oxygen concentrations harmful to fish and other aquatic species;

4. For a further permanent injunction directing PacifiCorp, its agents, servants, and employees, and all persons acting under, in concert with, or for it, to remediate the environmental impacts which PacifiCorp's unlawful conduct has caused;

5. For punitive damages in an amount according to proof or taking some measure to insure that an example is made of PacifiCorp to deter future conduct;

6. For pre-judgment interest according to proof;

7. For Plaintiffs' reasonable attorneys' fees pursuant to California Code of Civil Procedure § 1021.5;

**E. On the Fifth Claim for Relief:**

1. For all economic losses suffered by Plaintiffs related to lost use of property, lost profits, denial of quiet enjoyment and use of property, personal property damage, diminution in

the fair market value of property, and impairment of salability of property, according to proof at trial;

      2.      For general damages, in an according to proof at trial;

      3.      For a permanent injunction directing PacifiCorp, its agents, servants, and employees, and all persons acting under, in concert with, or for it, to cease operation of the Iron Gate and Copco dams and reservoirs in a manner that causes *Microcystis aeruginosa* blooms, discharges of toxins associated with the algae bloom, and discharges of water at temperatures and with dissolved oxygen concentrations harmful to fish and other aquatic species;

      4.      For a further permanent injunction directing PacifiCorp, its agents, servants, and employees, and all persons acting under, in concert with, or for it, to remediate the environmental impacts which PacifiCorp's unlawful conduct has caused;

      5.      For punitive damages in an amount according to proof or taking some measure to insure that an example is made of PacifiCorp to deter future conduct;

      6.      For pre-judgment interest according to proof;

**F.      On the Sixth Claim for Relief:**

      1.      For all economic losses suffered by Plaintiffs related to lost use of property, lost profits, denial of quiet enjoyment and use of property, personal property damage, diminution in the fair market value of property, and impairment of salability of property, according to proof at trial;

      2.      For general damages, in an according to proof at trial;

      3.      For a permanent injunction directing PacifiCorp, its agents, servants, and employees, and all persons acting under, in concert with, or for it, to cease operation of the Iron Gate and Copco dams and reservoirs in a manner that causes *Microcystis aeruginosa* blooms, discharges of toxins associated with the algae bloom, and discharges of water at temperatures and with dissolved oxygen concentrations harmful to fish and other aquatic species;

      4.      For a further permanent injunction directing PacifiCorp, its agents, servants, and employees, and all persons acting under, in concert with, or for it, to remediate the environmental impacts which PacifiCorp's unlawful conduct has caused;

5.      For punitive damages in an amount according to proof or taking some measure to insure that an example is made of PacifiCorp to deter future conduct;

6.      For pre-judgment interest according to proof;

**G.      On the Seventh Claim for Relief:**

1.      For all economic losses suffered by Plaintiffs related to lost use of property, lost profits, denial of quiet enjoyment and use of property, personal property damage, diminution in the fair market value of property, and impairment of salability of property, according to proof at trial;

2.      For general damages, in an according to proof at trial;

3.      For a permanent injunction directing PacifiCorp, its agents, servants, and employees, and all persons acting under, in concert with, or for it, to cease operation of the Iron Gate and Copco dams and reservoirs in a manner that causes *Microcystis aeruginosa* blooms, discharges of toxins associated with the algae bloom, and discharges of water at temperatures and with dissolved oxygen concentrations harmful to fish and other aquatic species;

4.      For a further permanent injunction directing PacifiCorp, its agents, servants, and employees, and all persons acting under, in concert with, or for it, to remediate the environmental impacts which PacifiCorp's unlawful conduct has caused;

5.      For punitive damages in an amount according to proof or taking some measure to insure that an example is made of PacifiCorp to deter future conduct;

6.      For pre-judgment interest according to proof;

7.      For Plaintiffs' reasonable attorneys' fees pursuant to California Code of Civil Procedure § 1021.5; and

**H.      On All Claims for Relief:**

1.      For an order mandating that PacifiCorp take every action necessary to assure all relief requested herein is obtained and funded;

2.      For the costs of suit incurred herein; and

/ / /

/ / /

1    3.   For such other and further relief as this Court may deem just and proper.

2    DATED: May 2, 2007.                    **COTCHETT, PITRE & McCARTHY**
                                            Joseph W. Cotchett (Cal. SBN 36324)
3                                           Barbara L. Lyons (Cal. SBN 173548)

4                                           **LAWYERS FOR CLEAN WATER, INC.**
                                            Daniel G. Cooper (Cal. SBN 153576)
5
                                            **KENNEDY & MADONNA, LLP**
6                                           Robert F. Kennedy, Jr. (*Pro Hac Vice* Pending)
                                            Kevin J. Madonna (*Pro Hac Vice* Pending)
7

8                                           By: _____
                                                    JOSEPH W. COTCHETT
9                                                 Attorneys for Plaintiffs

10

11                                **JURY DEMAND**

12        Plaintiffs demand a jury trial on all issues so triable.

13   DATED: May 2, 2007.                    **COTCHETT, PITRE & McCARTHY**

14                                          By: _____
                                                    JOSEPH W. COTCHETT
15                                               Attorneys for Plaintiffs

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

COMPLAINT                              35

**LIST OF EXHIBITS**

| Exhibit | Title |
|---------|-------|
| A | U.S. Department of the Interior, Bureau of Reclamation, Klamath River Basin Map (September 1999) |
| B | Harden, Blaine, "U.S. Orders Modification of Klamath River Dams," Washington Post, January 31, 2007 |
| C | Stone, David and William Bress, "Addressing Public Health Risk For Cyanobacteria in Recreational Freshwaters: The Oregon and Vermont Framework," Integrated Envt'l Assess. & Management, Vol. 3, No. 1 (2007) |
| D | Chorus, Ingrid & Jamie Bartram, eds., Toxic Cyanobacteria In Water: A Guide To Their Public Health Consequences, Monitoring And Management (World Health Organization 1999) (Excerpts) |
| E | Kann, Jacob, "Microcystis aeruginosa Occurrence in the Klamath River System of Southern Oregon and Northern California" (Feb. 3, 2006) |
| F | Letter from Russ J. Kanz, Environmental Specialist, State Water Resources Control Board to Magalie R. Salas, FERC (Apr. 22, 2004) |
| G | Karuk Tribe of California Submission to FERC, Recommended Terms and Conditions, Klamath Hydroelectric Project(March 28, 2006) |
| H | Kann, Jacob and Asarian, Eli, "Technical Memorandum: Longitudinal Analysis of Klamath River Phytoplankton Data 2001-2004" (Sept. 2006) |
| I | Kann, Jacob, "Partial Seasonal Summary of 2006 Toxic Microcystis aeruginosa Trends in Copco and Iron Gate Reservoirs and the Klamath River CA" (Nov. 2006) |
| J | Kann, Jacob and Corum, Susan, "Summary of 2005 Toxic Microcystis aeruginosa Trends in Copco and Iron Gate Reservoirs on the Klamath River, CA" (March 2006) |
| K | FERC Draft Environmental Impact Statement for the Klamath Hydroelectric Project, Section 3, Environmental Consequences. |
| L | U.S. EPA Region 9 Press Release, "Federal, state and tribal authorities advise caution on dangerous Klamath River algae" (Sept. 30, 2005) |